IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **DOUGLAS NORMAN** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | **Civil Action No:** |
| v. ) | |
| ) | **Judge:** |
| **VANDERBILT UNIVERSITY;** ) | |
| ) | **Magistrate Judge:** |
| **ALAN REED;** ) | |
| ) | |
| **C. STEVENS;** ) | **JURY DEMAND** |
| ) | |
| **JEREMY BOURGOIN.** ) | |
| ) | |
| *Defendants.* ) | |

# COMPLAINT

1. Plaintiff brings this action for damages alleging that Defendants violated Plaintiff's federal constitutional right against false arrest on **April 16, 2024**. Plaintiff seeks compensation and other just and appropriate relief for this violation of his legal rights.

# PARTIES

2. **Plaintiff Douglas Norman ("Mr. Norman")** is an adult resident of Davidson County, Tennessee.

3. **Defendant Vanderbilt University ("Vanderbilt")** is a private educational and research institution that is organized as a non-profit entity. Vanderbilt is principally located in Davidson County, Tennessee.

1

4. **Defendant Alan Reed ("Lieutenant Reed")** is a sworn law enforcement officer who, at all times relevant to this complaint, was employed by Vanderbilt University's "Public Safety" division.

5. **Defendant C. Stevens[1] ("Captain Stevens")** is a sworn law enforcement officer who, at all times relevant to this complaint, was employed by Vanderbilt University's "Public Safety" division.

6. **Defendant Jeremy Bourgoin ("Director Bourgoin")** is the Director of Vanderbilt University's Student Accountability office.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants reside in this district and the events at issue in this lawsuit occurred in this district.

## FACTUAL BACKGROUND

### A. Vanderbilt University's police department serves a public function

8. Vanderbilt University maintains a sub-entity that it refers to as "Vanderbilt University Public Safety" ("VUPS"), which operates under Vanderbilt's Division of Administration.

9. VUPS is for all practical purposes a police department. Within the geographical territory occupied by Vanderbilt University, VUPS operates as a full-fledged law enforcement agency authorized to exercise the full range of policing powers that are traditionally reserved to the states.

---

[1] Plaintiff has been unable to discern Captain Stevens's full first name from the available records and public sources that Plaintiff currently has access to. Plaintiff presumes that Captain Stevens's employment, rank, first initial, and last name provides sufficient information to put him on notice that he is the intended defendant in this suit.

10. As Vanderbilt's internet website[2] proudly declares, VUPS is "one of Tennessee's largest law enforcement agencies…."

11. VUPS has over 250 staff members, many of which are "sworn officers" that are "commissioned through the Metro Nashville Police Department."

12. All of VUPS's sworn officers "have completed training at a state-certified police academy."

13. VUPS holds four separate accreditations from state, national, and international law enforcement bodies, including such agencies as CALEA (Commission on Accreditation for Law Enforcement Agencies), IACLEA (International Association of Campus Law Enforcement Administrators), and TLEA (Tennessee Law Enforcement Accreditation).

**B. Vanderbilt maintains an illegal policy with regard to arrests for trespass**

14. On March 26, 2024, Vanderbilt police arrested a local news reporter who had gone to Vanderbilt to cover student protests.

15. The VUPS officers did not offer the reporter the opportunity to leave campus, instead just taking him into custody and taking him to jail.

16. However, when the VUPS officers brought the reporter before the judicial commissioner and requested that trespass charges be issued against him, the commissioner declined to issue the requested criminal charges.

17. The arrest of this reporter swiftly triggered a public outcry.

18. On April 3, 2024, Vanderbilt retained an independent law firm, Neal and Harwell, to investigate the reporter's arrest and to review Vanderbilt's relevant policies.

---

[2] Available at: https://publicsafety.vanderbilt.edu/about/mission-and-accreditation/.

19. Neal and Harwell conducted their investigation, and developed a report.

20. The report, which would be issued on May 30, 2024, made several findings.

21. One of the findings in the report was that the VUPS officers had not given the reporter the opportunity to leave campus before arresting him.

22. Another finding was that the Davidson County judicial commissioner had found that there was a lack of probable cause to support the criminal trespass charge.

23. The report also made several recommendations, one of which was that, "Absent emergency situations or specific safety concerns, before any arrest for criminal trespass, the potential arrestee be warned and given an opportunity to leave the area."

24. The commissioner's probable cause finding, as well as the Neal and Harwell recommendation that alleged trespassers be given the opportunity to leave, were consistent with Tennessee law's legal limitations on the crime of criminal trespass. In that regard, Tennessee's trespass statute states that it is a defense to prosecution if:

    (1) A person entered or remained on property that the person reasonably believed to be property for which the owner's consent to enter had been granted;

    (2) The person's conduct did not substantially interfere with the owner's use of the property; and

    (3) The person immediately left the property upon request.

### C. Mr. Norman

25. Mr. Norman is a former Vanderbilt undergraduate student.

26. In late 2022 and spring 2023, while Mr. Norman was still enrolled as a Vanderbilt student, he was the victim of domestic violence crimes and other forms of abuse perpetrated by his now ex-girlfriend, who was also a Vanderbilt student.

4

Case 3:25-cv-00296    Document 1    Filed 03/13/25    Page 4 of 18 PageID #: 4

27. In early 2023, Mr. Norman was placed on a leave of absence from Vanderbilt based on academic deficits. Mr. Norman appealed the leave of absence, and was informed that he could apply for "reinstatement" after one year.

28. In August 2023, Mr. Norman was evicted from his student housing by VUPS officers, who directed him to not come back onto the campus.

29. However, during this eviction process Mr. Norman asked the VUPS officers if he would still be able to come onto campus to attend Vanderbilt athletic and other special events. Mr. Norman had been a member of Vanderbilt's "Spirit Team" when he was a student, and remains an avid Commodores fan.

30. The VUPS officers informed Mr. Norman that it would not be a problem for him to attend Vanderbilt athletic events, but that to enter campus for any other purpose he would need to contact a campus supervisor.

31. Later that same month, Mr. Norman attended a Vanderbilt football game on campus without any issues.

32. In October 2023, Mr. Norman attended a Vanderbilt basketball game on campus without any issues.

33. On November 14, 2023, Mr. Norman attended a Vanderbilt basketball game. However, VUPS arrested him at the game and charged him with "Trespassing."

34. On November 30, 2023, an in-house Vanderbilt attorney issued a letter to Mr. Norman stating that as a general matter he was prohibited from entering campus property for any reason other than to seek medical treatment at Vanderbilt University Medical Center. ("VUMC"). However, the letter also detailed a process for Mr. Norman to obtain permission to come onto campus for particular purposes:

If you feel you have a need to enter Vanderbilt property for any reason (other than medical treatment at Vanderbilt University Medical Center), you must first contact Vanderbilt University Public Safety at 615-322-2745. You will be put in contact with the shift supervisor, to whom you must tell the reason for your visit and where you want to go before permission may be granted.

35. From March 9, 2024 through the early hours of March 10, 2024, Mr. Norman's ex-girlfriend repeatedly called and texted Mr. Norman's phone.

36. Feeling threatened, Mr. Norman obtained a "Harassment" warrant and an *ex parte* order of protection against his ex-girlfriend from the Davidson County, Tennessee General Sessions Court.

37. The case against Mr. Norman's ex-girlfriend was set for a hearing in Davidson County, Tennessee General Sessions Court on April 16, 2024.

38. On March 25, 2024, Mr. Norman emailed Vanderbilt's Director of Student Accountability, Mr. Jeremy Bourgoin, to request a meeting with him by phone.

39. Director Bourgoin emailed Mr. Norman back that same day, declining to speak to him but inviting him to explain what the reason for the call would be.

40. Mr. Norman replied to Director Bourgoin by email that same day, asking to be able to discuss "the trespass" with him.

41. On March 31, 2024, Director Bourgoin emailed Mr. Norman back, stating that Vanderbilt's access restrictions would remain in place unless and until Mr. Norman was re-enrolled as a student and had completed Vanderbilt's "accountability process."

### D. Mr. Norman's April 16, 2024 Court Date

42. On April 16, 2024, Mr. Norman attended court for the case against his ex-girlfriend.

43. At the court date, Mr. Norman's ex-girlfriend's attorney produced an affidavit, ostensibly signed by a Vanderbilt official, which claimed that Mr. Norman had been "expelled" from Vanderbilt University.

44. Mr. Norman had not been "expelled," but rather had been told that he could apply for "reinstatement" after one year.

45. The Vanderbilt affidavit was prejudicial to Mr. Norman at the hearing, and the judge ultimately denied Mr. Norman's petition for an order of protection.

46. From Mr. Norman's perspective, the Vanderbilt affidavit was material to the adverse outcome of his order of protection petition.

47. Feeling defamed and ambushed by the Vanderbilt affidavit, Mr. Norman planned to appeal the denial of the order of protection so that he could have a rehearing.

48. To prepare for this appeal, Mr. Norman sought documentation from Vanderbilt to negate the false characterization that he had been "expelled."

49. Later that same day, Mr. Norman followed the protocol to come onto campus outlined in the November 30, 2023, letter by contacting VUPS Dispatch.

50. In a call recorded by VUPS, Mr. Norman spoke with a Dispatch Supervisor.

51. Mr. Norman complained about the Vanderbilt affidavit and what had happened in court, and informed the dispatch supervisor that he would like to enter campus to speak with someone about it.

52. The supervisor told Mr. Norman that all of the VUPS staff were in a meeting, but that after the meeting a detective could speak with Mr. Norman.

53. Mr. Norman asked if he could come at 5 P.M. to speak with someone, to which the supervisor responded, "I can definitely find somebody for you to talk to."

54. Mr. Norman and the dispatcher continued talking, and the dispatcher made clear that she could not address the affidavit issue herself. Mr. Norman asked if she could let a campus supervisor know that he was coming, and she said "Sure."

55. Mr. Norman then stated that he would be coming to VUPD, and also to the Student Accountability office.

56. The dispatch supervisor asked for Mr. Norman's name.

57. Mr. Norman was reluctant at first to provide his full name to the supervisor without his attorney being involved; however, when she explained that she needed his name in order for her to notify VUPS and Student Accountability that he was coming, Mr. Norman gave his information, identified himself as "DJ Norman," and told her that she could let the others know that "Mr. Norman" was coming.

58. The dispatch supervisor then told Mr. Norman that she would let the relevant parties know that he was coming.

59. After hanging up with the dispatch supervisor, Mr. Norman called VUPS back, spoke with the dispatch supervisor again, and confirmed that she was going to let the relevant parties know that he was coming so that they would know that he was going "by the book" in his manner of coming to the campus.

### E. VUPS entraps Mr. Norman

60. On information and belief, after getting off the phone with Mr. Norman the VUPS dispatch supervisor did relate to other Vanderbilt and VUPS staff the fact that Mr. Norman was coming.

61. Mr. Norman went to Vanderbilt at approximately 5 P.M., as he had told the dispatch supervisor that he would.

62. Mr. Norman planned to go to the Student Accountability office, the financial aid office, and VUPS.

63. Mr. Norman first attempted to find the Student Accountability office. He had never been there before, and asked multiple Vanderbilt staff members along the way how to find it.

64. *En route* to Student Accountability, Mr. Norman found the Student Affairs office.

65. At the Student Affairs office, Mr. Norman asked if he could speak with a dean regarding the situation before going over to Student Accountability.

66. An administrative assistant for the Associate Dean of Community Standards and Support, Ms. Jessica Carter, spoke with Mr. Norman about the affidavit and about his order of protection case.

67. Mr. Norman explained his complaint to Ms. Carter regarding the inaccurate affidavit, and asked for documentation from Vanderbilt showing that he had never been "expelled" so that he could have it for his order of protection appeal.

68. Ms. Carter told Mr. Norman she understood, offered him a water, said he could take a seat, and said she would go explain things to her supervisor. She then left to go into other parts of the office, seemingly to do what she had just told Mr. Norman she would do.

69. After several minutes, Ms. Carter returned to Mr. Norman and continued speaking sympathetically with him regarding the situation.

70. Ms. Carter affirmed Mr. Norman's perspective several times, apologized for the affidavit, and said that she was "so sorry."

71. However, unbeknownst to Mr. Norman, the Student Affairs staff had apparently called Mr. Bourgoin, the head of Vanderbilt Student Accountability, who had told them to keep Mr. Norman in the Student Affairs office so that VUPS could arrest him.

72. Director Bourgoin then contacted VUPS to have them arrest Mr. Norman.

73. VUPS received the call from Director Bourgoin, and dispatched VUPS Lieutenant Alan Reed to arrest Mr. Norman.

74. Mr. Norman continued talking Ms. Carter while Lt. Reed walked to Student Affairs. Ms. Carter continued affirming Mr. Norman's perspective, and acting as if she agreed that Mr. Norman had been wronged.

75. However, Lt. Reed then entered Student Affairs, confronted Mr. Norman, and told him that he had been banned from campus.

76. Mr. Norman explained to Lt. Reed that he had talked to VUPS Dispatch, and that he had obtained permission to come onto campus.

77. Lt. Reed responded by interrogating Mr. Norman regarding whom he had talked to at Dispatch. In response, Mr. Norman answered Lt. Reed's questions.

78. Mr. Norman contacted an attorney over the phone during this conversation, and put the attorney on speakerphone.

79. The attorney opined to Lt. Reed that Mr. Norman was under the impression that he had permission to be on campus. The attorney then asked if Lt. Reed could just give Mr. Norman a warning, and allow him to leave.

80. Reed responded that per VUPS "policy," he had to take Mr. Norman into custody.

81. Mr. Norman identified the dispatcher he had spoken with by name, and said that he had notified them that he would be at VUPD and Student Accountability.

82. Reed responded by reiterating that he would arrest Mr. Norman.

83. Mr. Norman explained to Reed that he was not attempting to be adversarial, but that he had followed the protocol that had been laid out for obtaining permission to enter campus and was in the middle of a meeting when Reed came into the office.

84. Mr. Norman offered to identify the Student Affairs staffer that he had been speaking with. However, Reed responded to this by ordering Mr. Norman to put his hands behind his back, so that he could be handcuffed.

85. Mr. Norman asked Lt. Reed to contact VUPS, which Reed did.

86. Lt. Reed got on his dispatch radio, and reported "one detained."

87. On the other end of the dispatch radio, another officer – who on information and belief was Lt. Reed's supervisor – acknowledged without further comment that Reed had detained Mr. Norman.

### F. Lieutenant Reed takes Mr. Norman to jail

88. Lieutenant Reed walked Mr. Norman to Reed's patrol car, and explained that he was going to take Mr. Norman to book him into the jail.

89. Mr. Norman's attorney, who was still on speaker phone, asked what Reed was arresting Mr. Norman for.

11

90. Reed responded that he was arresting Mr. Norman for criminal trespass.

91. Mr. Norman explained to Reed again that he had followed the protocol to gain permission to enter campus, and asked why Lt. Reed could not just let him depart rather than arresting him.

92. Reed explained that per Vanderbilt policy, "Anyone that has been issued a criminal trespass warning on this university is arrested and taken to booking."

93. With regard to Mr. Norman's repeated explanations that he had spoken with Dispatch before coming, Reed stated, "Whoever you talked to did not notify the authorities at Vanderbilt police department to let them know that you were coming back on campus."

94. Mr. Norman then asked if Reed could take him to VUPD, so that they could attempt to sort it out there.

95. Reed disregarded the request and put Mr. Norman into Reed's patrol car.

96. Norman continued explaining that he had gone through the process of speaking with Dispatch, and that he had followed the protocol to obtain permission to enter campus. Mr. Norman also explained that he had the call logs on his phone.

97. Reed could easily have confirmed with Dispatch whether or not Mr. Norman had called, and could even have obtained the recordings of the calls if he had wished. Instead, Reed disregarded the issue and proceeded with the arrest.

98. VUPS Captain C. Stevens came out to Reed's patrol car, informed Mr. Norman that he was going to hang up the call with his attorney, and hung up Mr. Norman's phone.

99. Mr. Norman asked Captain Stevens if he could speak to him regarding the arrest – however, Captain Stevens ignored him.

100. After a short additional wait, Lt. Reed drove Mr. Norman to jail.

101. Mr. Norman and Reed continued discussing the arrest while *en route* to jail.

102. Lt. Reed began expressing sympathy for Mr. Norman regarding the fact that Norman had spoken with Dispatch before coming and thought he had permission.

103. However, Lt. Reed expressed that he was subject to a chain of command, intimating that he had to arrest Mr. Norman because that is what he was told to do.

104. Lt. Reed told Mr. Norman that when he goes before the judicial commissioner he should bring up the information about having gotten permission before going to campus.

105. Lt. Reed stated, "we arrest a lot of people for trespass on Vanderbilt property."

106. Lt. Reed also stated that even if the trespass is by mistake, "If they're on the campus property, they generally go to jail" because "it's just Vanderbilt's policy."

107. Lt. Reed explained to Norman that the only information he had was what his Captain had told him, which was that there were two prior warnings and Mr. Norman was not supposed to be on campus.

108. Lt. Reed explained that the arrest decision was ultimately up to Student Accountability, meaning Director Bourgoin.

109. At no point in this discussion did Lt. Reed acknowledge Tennessee's legal limitation on criminal trespass charges wherein if a suspect reasonably believed that he was not trespassing, did not substantially interfere with the owner's use of the property, and was willing to depart voluntarily when confronted then he is not guilty of trespass.

### G. Lt. Reed initiates criminal charges against Mr. Norman

110. Lt. Reed booked Mr. Norman into the Davidson County jail, and then obtained a criminal trespass charge against him.

111. To initiate the trespass charge, Reed drafted an affidavit alleging the factual basis for the trespass and presented it to Davidson County judicial commissioner.

112. Although Reed was very well aware of the fact that Mr. Norman had contacted Dispatch before coming to campus and had obtained permission before coming, and Reed had in fact suggested to Mr. Norman that Norman tell the commissioner about this fact, Lt. Reed failed to disclose these facts in his affidavit.

113. Likewise, Lt. Reed failed to disclose that he had refused Mr. Norman's offer to depart campus voluntarily in lieu of arrest.

114. Based on Lt. Reed's affidavit, the commissioner issued the requested criminal trespass misdemeanor charge.

115. Mr. Norman was released on bond a few hours after being charged.

### H. Mr. Norman's criminal charges are dropped

116. After getting out of jail, Mr. Norman retained criminal defense counsel and appeared in General Sessions Court to defend himself from the trespass charge.

117. On September 4, 2024, the General Sessions Court retired the criminal trespass charges at the request of the District Attorney's Office.

## CLAIMS FOR RELIEF

### COUNT I: FALSE ARREST IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)

118. Plaintiff hereby reincorporates paragraphs 1 – 117 by reference.

119. On April 16, 2024, Defendant Reed arrested Mr. Norman. Reed was made fully aware of Mr. Norman's legal defense to the arrest, but continued with the arrest and took Mr. Norman to jail regardless.

120. Defendant Stevens was involved in approving and authorizing the arrest, and was involved in the decision to disregard Mr. Norman's legal defense to the arrest.

121. Defendant Vanderbilt is responsible for the arrest, because Vanderbilt's policy at the time was to arrest all perceived and/or mistaken trespassers without giving them the opportunity to depart voluntarily in lieu of arrest.

122. Defendant Bourgoin ordered VUPS to conduct the arrest.

123. Defendants acted under color of state law in effectuating the arrest. Although Vanderbilt is a private university, VUPD performs the public function of law enforcement. Reed and Stevens are sworn law enforcement officers. Bourgoin, although not a law enforcement officer himself, gave the arrest order and acted in concert with VUPS's sworn law enforcement officers to cause the arrest.

124. The individual Defendants acted in blatant disregard for Mr. Norman's constitutional rights, disregarding his repeated explanations of innocence and refusing to allow him to just leave campus voluntarily.

125.    Defendants' illegal arrest caused Mr. Norman to suffer a deprivation of liberty, physical discomfort, and emotional harm.

### COUNT II: MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)

126.    Plaintiff hereby reincorporates paragraphs 1 – 117 by reference.

127.    On April 16, 2024, Defendant Reed initiated criminal charges against Mr. Norman by swearing out a warrant and presenting it to the magistrate.

128.    Reed failed to disclose the exculpatory information regarding Mr. Norman's call with Dispatch to the magistrate, as well as his offer to leave campus in lieu of arrest, which resulted in the charges being issued.

129.    Taking the exculpatory information into account, Reed did not have probable cause to seek criminal trespass charges against Mr. Norman.

130.    Defendants Stevens and Bourgoin participated in the decision to file charges, by directing Reed to arrest Mr. Norman for alleged trespassing and take him to jail.

131.    Defendant Vanderbilt is responsible for the criminal charges, because Vanderbilt's policy at the time was to arrest and prosecute all perceived and/or mistaken trespassers without giving them the opportunity to depart voluntarily.

132.    Mr. Norman suffered a deprivation of liberty because of the criminal charges, which extended his detention beyond what he would have suffered from just the arrest.

133.    Mr. Norman ultimately prevailed against the criminal charges, which were retired and subsequently dismissed by the General Sessions Court.

134. Defendants acted under color of state law in effectuating the charges. Although Vanderbilt is a private university, VUPD performs the public function of law enforcement. Reed and Stevens are sworn law enforcement officers. Bourgoin, although not a law enforcement officer himself, gave the arrest order and acted in concert with VUPS's sworn law enforcement officers to cause the arrest and criminal charges.

135. The individual Defendants acted in blatant disregard for Mr. Norman's constitutional rights, disregarding his repeated explanations of innocence and refusing to allow him to just leave campus voluntarily.

136. Defendants' illegal criminal charge caused Mr. Norman to suffer a deprivation of liberty, physical discomfort, financial harm, and emotional harm.

## **REQUEST FOR RELIEF**

**WHEREFORE**, these premises considered, Plaintiffs pray:

1. That the Defendants Answer this Complaint within the time provided by law.
2. That this cause be tried by a jury.
3. That judgment for Plaintiff enter against the Defendants on each count.
4. That Plaintiff be awarded nominal, compensatory, and punitive damages against Defendants.
5. That Plaintiff be awarded attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).
6. That the court costs in this matter be taxed to Defendants.
7. That Plaintiff be awarded all other relief to which it may appear she is entitled in the interests of justice.

Respectfully submitted,

*s/ Kyle Mothershead*
*s/ Aaron Rothbaum*
Kyle Mothershead, BPR 22953
Aaron Rothbaum, BPR 36572
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Brentwood, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: Kyle@relentlesslaw.com